Good morning, your honors. And may it please the court, my name is Humphrey Smigiel, Assistant General Public Defender here on behalf, for most things here on behalf of the Moore-Taylors, the Yankees petitioner in this case. The test for equitable tolling, which is what Chief Taylor sees, is to call Dr. Holland and the LCA from this court. One, the court must find, the district court must find that extraordinary circumstances existent that prevent the naivest petitioner from accessing the courts in a timely manner. And two, that the petitioner exercise the reasonable diligence under the circumstances. In this case, the district court, Judge Jones, failed to consider the totality of the circumstances, particularly as to the diligence upon that totality of the circumstances is standard, at least in minimum impairment cases. That is to say, when minimum impairment is asserted, as it is here, is the basis for an extraordinary circumstance in that court. So the totality of circumstances in this case is Mr. Taylor's double minimum impairment. He's been diagnosed with schizophrenia. The diagnosis only happened once an expert was obtained by my office. But he had a long history before his arrest, before his conviction, and then almost immediately after his incarceration, a long history of going on this treatment. In fact, he spent from September 1997, within a couple of weeks, he was admitted to the Department of Corrections. He was held on September 3, roughly six years, and rarely if ever seen to normal population. If he did, it was for no appraisal at the time. He was either in the mental health unit or mental health inclusion, or at the very best, the extended care unit. It was a short extension from the mental health unit. It seems that he improved, though, toward the end of 2003. So how do we tell from this record that he was still too impaired mentally after, like, November 2003? Well, there are a couple of factors in the record, Your Honor, that tell us that. One is he committed suicide. He attempted to commit suicide the third time. He attempted in 2001 and 2002 before he was released into general population. Then he attempted again, probably his most visceral attempt. He attempted to hang himself and slit his own wrists sort of at the same time in 2006. But there is a gap there between 2003 and that awful attempt in 2006. There's a couple of things I think that's right to bring to your attention from the record. One is his cognitive impairment, his cognitive deficiency, which both during pre-trial and during his ABS proceedings, he has been diagnosed with borderline intelligence. Pre-trial, Dr. Hess, who was retained by the Public Defender's Office for purposes of competency and intelligence evaluation, gave him a full-scale IQ score of 75. The expert on this case, Dr. Schmidt, gave a full-scale IQ test of 79. But the IQ on its own can't be enough for him because he did eventually defile. I mean, there'd have to be some... And that wasn't changing over time, right? Which is pretty much the point, actually. It was never going to change. I can see that his mental health, the manifestations of his mental health and awareness fluctuate over time. Although his was pretty profound through most of his stay up to when he filed his federal petition in 2008. And by the way, the four best cases. So there's the variations in a mental impairment when you're talking about normal levels of schizophrenia or bipolar to be expected, it's the nature of the mental illness that some days look better than others. And they bear down on it after 2003. So 2006, that's about a two-and-a-half-year period. What is it in the record that you think supports that he was severely mentally impaired and couldn't figure out to finally file a petition? Well, as the expert, Dr. Schmidt, who concludes on the OR365, says that he is the double impact, if you will, of schizophrenia. And his borderline intelligence rendered him essentially unable to access in any affirmative way meaningful assistance. And the post-case says that was he in the general prison population during this time period, and wasn't he functioning pretty well? Well, it depends on what functioning pretty well means. As far as he had a couple of jobs, he was in, actually, he was in between 03 and 08, I think it was. He was back and forth, not with regularity as he was before 2003, but he did go back and forth quite a bit, still from 2003 to 2008, in and out of the mental illness unit. Did he take his GED? I don't know that he attempted to take his GED. He came within one point of passing it. I do know that's the only time he attempted. His cognitive impairment, as Dr. Freeland said, was mutable the whole time. I think one of the issues that here's the difficulty I see is that you've got, you're arguing one says he can't, he was so severe, he couldn't file a federal petition, but as the district court pointed out, he did file state petitions. And there were two findings, both in 2003 and 2007 by the state courts, that he hadn't shown good cause for delay. I think that those two positions, if you look at those two positions and judge the position, they're very, very instructive as to just how available and meaningful assistance was. And under the Mills case, and this is something that the district court completely failed to incorporate into its analysis, the Mills case that says that when an impairment is the proffered extraordinary circumstance. The district court should also look at the effect of that mental impairment on the petitioner's attempt to be diligent in order to access the court. In this case, if you look at the 2003 petition, which is his first meaningful attempt to access the court anyway. And by the way, that happened within six weeks of his release into general population, which suggests that once he has more access, he is able to accept it. But that is not a main, the Mills case also says that it should be a means, the adequate entry into the abuse process. In other words, something that a court is able to rule on as a cognizable attempt at relief. If you look at his first state court petition, it's not a meaningful attempt. Whoever assisted him, and I'm pretty sure it's a different person than who assisted him with the second one, which is a very sophisticated and meaningful attempt. It makes constitutional arguments about ineffective assistance to counsel. It sets cases and amendments. Whoever helped him write them knew what they were doing, particularly if you look at the state appeal, which is a table of contents, a table of 40s, and we had handwritten, sophisticated appeal. It's the opposite on the first one. The first one cites a single, it cites no federal constitutional, I forgot to keep going. It cites no federal constitutional right. It's a single Nevada law, which is NRS, Nevada Revised Statute 176.555. If you look that statute up, it's one sentence longer, and it says that the court may at any time correct an illegal sentence. The Nevada Supreme Court says what that one-sentence statute is for is to allow a court to correct errors in sentencing, such as when you use the same fire against you twice, that kind of thing. In a case called Evers V. States, the Nevada Supreme Court said that is not an appeal statute. If you're a Nevada State prisoner, and you want to challenge your conviction or your sentence, you proceed under Statute 175, which does define a lot of the intent of 34, a lot of the habeas rights in Nevada. That petition, which starts at 470 in the record, I think, if you take another look at it, is not a meaningful attempt. It's a conduct attempt, whoever helped him. But it did nothing to exhaust any federal rights. The second one, which he also accessed in his first available attempt, is a meaningful attempt. In Bill's case, it requires the district court to examine the effect of his mental impairment on his ability to access meaningful access. His cognitive impairment is, too, experts have found in this case, both pre-trial, Dr. S., and in this proceeding, Dr. Smith, have said that the combination of impairments, particularly the borderline intellectual functioning, and the result of a person who's very withdrawn socially, if you're annoyed because of his schizophrenia, mistrustful, the record shows that he was attempting to do wrong about the state of his legal proceedings, particularly early on. Somebody notes he talks about his appeal in 1997 or 98. There was no appeal in 1997 or 98. That's a fantasy. This is a petitioner who, like the Forbest petitioner, wasn't going to go to court until somebody, it didn't matter, just like the Forbest petitioner was characterized in this court's opinion, it didn't matter if somebody said you have to go to federal court or you have to make this assertion of rights. It didn't matter. So this petitioner, if somebody said that, he had to have meaningful assistance in his cognitive impairment, and also being on lithium until 2007, which is a distracting sort of lack of, it causes a lack of focus and a side effect. All of those things together, bouncing around from prison to prison, all of these things, basically meant that he never found, the record does not suggest that he ever found, anything like meaningful assistance until he got to New York State Prison shortly after his last suicide attempt, stopped taking lithium, and basically was at the mercy of luckily finding somebody who knew what they were doing. And under those circumstances, I think what he's holding is appropriate. Let's move that one right over. Thank you, Cassie. May it please the Court, Heidi Stern on behalf of Respondents of L.E.A.S. There's no dispute here that Mr. Taylor suffered from mental illness. He was, however, in the general population of the prison system from September of 2003 through May of 2006, as we noted in our brief. And as a result of that and other factors, he is unable to meet his burden. To show that for the entire approximately 10-year period that he's now asking for tolling, he had a severe mental illness that actually caused him to not know that he needed to timely file, or that he was unable to prepare his petition. And this Court has hit upon many of the things that he was able to do that demonstrate to us that he was functional. He was mentally ill, but he was functional. He was able to seek help, in fact, in 1998. Or he comments in his first petition, excuse me, that in 1998 he actually did try to seek help, and that that person was then moved out of the prison system. There's no evidence in the record that he continued that attempt to seek help. There's also no evidence in the record that during the period of time he was in the mental health unit, he couldn't get legal assistance. My personal understanding is that legal assistance remains available even if you're in the mental health unit. Is there evidence of that in the record? Not in the record, no, Your Honor. But there is, like I said, no evidence that he couldn't. The one thing that may be a bit of evidence that he could seek help in the mental health unit was that his second state petition. The record is a little unclear, but it appears that he either had that prepared or actually filed it when he was still in MHU. And that was in 2007. So I'll just go ahead and address Dr. Schmidt's report. His report sheds very little light on the situation of Taylor's mental illness. For example, he himself found that Taylor was only mildly impaired, and that's at ER 364. He also gives no explanation of how schizophrenia, a diagnosis of schizophrenia versus a diagnosis of bipolar disorder, caused the inability to file a petition or caused Taylor to not understand the need to do so. And that distinguishes this case from Forbis. Forbis was a case where the petitioner, even if he had known, the court finds, even if he had known that he needed to do the filing, someone had specifically told him, you're deadly tomorrow, he still wouldn't have done it because his delusions were very specific towards him thinking that he didn't need to file because this was all a setup. In this case, even if you accept Dr. Schmidt's premise that Taylor was schizophrenic and had auditory hallucinations, those were not geared at all towards his legal requirements. In fact, by filing several court papers, in addition to two state case petitions, Taylor shows that he knew he needed to take care of his legal rights. And the other thing that the Schmidt report fails to shed light on is there's no explanation in that report as to what changed in 2008 where Taylor all of a sudden was able to file a federal petition. There's really no explanation for how his supposed schizophrenia changed over time. There's also no commentary on what type of different treatment should have been offered by the prison system. The extensive records show that the prison system did try to treat Mr. Taylor. And I would also point this court out to his intellectual capacity. Judge Thomas, you asked when he took the GED. That was in 1998, so shortly after arriving in prison, and he did almost pass that. At that time in 1998, he also worked as a porter and on the yard. He went to school, probably to prepare to take the GED. In addition, during his time in the general population, he worked as a culinary assistant and, again, was able to seek help to file a state petition. There's really no explanation as to why he couldn't seek that same help to file a federal petition. Do you agree that from 2003 to 2006, the record is limited about how he was doing mentally? I don't think the record is limited as to how he was doing mentally. I would point the court to... Oh, right, no, correct. But there are notes as to if he still met with mental health doctors. So we still have an extensive record of how he was doing. It's just that he was doing fine. So, for example, I would point the court to... He was categorized as mildly impaired, and that's in ER 1522-24 and 1526-1527. So there's four categories. When he had that horrific suicide attempt, at that point he was categorized as four, the highest impairment. During the rest of the time before that, from, like, 2003 to 2006, when he was in the general population, he was consistently categorized as a one or a two, so a low impairment during that time period. Specifically, also, he says in December of 2003 that he is, quote, doing well. He had some occasional complaints about the side effects of his medications, and those are changed accordingly, as the record shows he did take various medications, mostly due to his own complaints about side effects. But he says he's doing well, and, again, he's in the general population. Does that answer your question? It does. Okay. Finally, I would just point out that the question of an evidentiary hearing is reviewed by this court as an abuse of discretion standard, and that in this case we have an extensive record. We have an unconflicted record. We're not disputing his mental impairment, nor the validity of the record that we have before the court. And so in this case, a hearing would really not add anything. So unless the court has further questions, I'll see you then. Thank you. We'll give you one minute for a model. Thank you, Your Honor. For the one minute. As far as the prison categorizations go, they are impeached by the Smith Report, and this is a comparison that fails to appear in the district court's analysis. Dr. Smith said in his report there's no such thing as mild schizophrenia. There's no such thing as moderate schizophrenia. He says that it's the worst of the severe mental illnesses. And essentially what happened in the district court opinion is, taking the impressions some of them lay, he probably, it's hard to say, depends on who's writing them, his clinical impressions, and putting all of his weight on those, he's building an opinion that is counting all the expert proffered in this case. But he did eventually file a federal petition. So how do you reconcile that with, I think you're arguing that schizophrenia could be so bad that he could never do anything, but that he did eventually file? I'm not. Actually, I'm arguing that both his battles with schizophrenia, and particularly his immutable cognitive impairment, which never changes over time, it's not, you can't take medications for it, and the sort of social withdrawals and social impairments that come with that, that the doctor talks about in his report, and that the first doctor back in 97 talked about, 96 actually, that all of that, that's the totality of the circumstances. It's not just parsing, which is exactly what the district court did in error, parsing away the mental illness, the fluctuations in the management stations of the mental illness, and giving no analysis or examination, or is examined in the Bill's case, to examine the mental impairments and its effect, their effect on the ability to access. And as far as the year that went by between the Avis petition, the second Avis petition and the federal, if I was in an early Avis petition at the same time, it was completely unexhausted. I mean, it would have been a feel, and it's been for about six months. He was very timely. Within two months of the Nevada Supreme Court's word, so once the ball got rolling with somebody assisting him, everything was on time, better than on time. As far as an equitable or an evidentiary hearing goes, I think we are entitled to one if the court decides not to render this unequal to only outright. The standard is prima facie showing, essentially, we take the pleadings as true in this case. I think if you look at both state court petitions plus our petition, there are ample allegations of impairment and diligence in this case, and impairment really is the only analysis with that. We should go back and ask Judge Jones to examine more closely, more closely than he did the first time at the opinions and the record evidence in this case. Thank you, Counselor. Thank you, sir. We'll be in it for a decision.
judges: Thomas, Friedland, Carney